ABRAHAM HAMRA,

                       Plaintiff,

   -against-

AL JAZEERA MEDIA NETWORK, a foreign company,
and   AL JAZEERA INTERNATIONAL (USA) LLC,

                       Defendants.
------------------------------------------------------------------ X

Civ. No. 2:25-cv-4774

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Abraham Hamra, by his undersigned counsel, complains of Al Jazeera Media Network and Al Jazeera International USA LLC (collectively, "Al Jazeera" or "Defendants"), and alleges for his complaint upon information and belief as follows:

## INTRODUCTION

1. This is an action for damages against Al Jazeera for defamation, specifically libel per se, arising from a false and defamatory Instagram post published by Defendants that accused Plaintiff, a respected New York immigration attorney, of being paid by the Israeli government to visit aid sites in Gaza as part of a propaganda effort.

2. The statement is categorically false. Plaintiff has never been paid by the Israeli government or any related entity for any purpose, including to visit or promote aid sites in Gaza.

3. Defendants knew or should have known the statement was false at the time of publication, as it was based on no credible evidence and contradicted publicly available information about Plaintiff's independent activities and professional background.

4. The defamatory statement implies that Plaintiff violated the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 et seq., by acting as an unregistered agent of a foreign government a serious federal crime that carries criminal penalties. This accusation directly injures Plaintiff's reputation and standing in his profession as a lawyer, where integrity, independence, and compliance with U.S. laws are paramount.

5. As a result of Defendants' libelous publication, Plaintiff has suffered significant harm, including damage to his professional reputation, loss of business opportunities, emotional distress, and public humiliation. Plaintiff seeks compensatory damages, punitive damages, and other relief as provided by law.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Plaintiff is a citizen of New York. Defendant Al Jazeera Media Network is a foreign entity headquartered in Qatar. Defendant Al Jazeera International (USA) LLC is a Delaware limited liability company with its principal place of business in Washington, D.C.

8. Personal jurisdiction over Defendants is proper under New York Civil Practice Law and Rules (CPLR) §§ 301 and 302. Defendants have substantial contacts with New York, including

distributing content through Al Jazeera English and other channels to New York audiences via streaming platforms such as Sling TV, YouTube, Roku, Amazon Fire TV, and Apple TV.

9. Defendants purposefully direct content toward U.S. audiences, including in New York, and maintain active social media presence on platforms like Instagram, where the defamatory post was published and accessible to New York residents.

10. The defamatory statement caused tortious injury within New York by harming Plaintiff's reputation in his home state and professional community.

11. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claim occurred here, including the publication and dissemination of the defamatory statement to New York audiences, and the harm suffered by Plaintiff, who resides and practices law in this District.

**THE PARTIES**

12. Plaintiff Abraham Hamra is a citizen of the United States domiciled in and resident of Nassau County, New York in this judicial district. He is a partner at Cohen, Tucker & Ades P.C., a New York-based immigration law firm, where he specializes in providing personalized legal services to clients.

13. Plaintiff is recognized as a New York Metro Rising Star by Super Lawyers and is fluent in English, Arabic, and Hebrew.

14. He is also an active social media user, maintaining an Instagram account (@abrahamhamra) with over 80,000 followers, where he shares content related to his heritage as a Syrian Jewish refugee, counters misinformation, and advocates against antisemitism.

15. Defendant Al Jazeera Media Network is a global media conglomerate headquartered in Doha, Qatar. It operates multiple channels, including Al Jazeera Arabic and Al Jazeera English, and distributes content worldwide via television, online platforms, and social media, including Instagram under the handle @aljazeeraenglish.

16. Defendant Al Jazeera International (USA) LLC is a Delaware limited liability company and a subsidiary of Al Jazeera Media Network. Its principal place of business is located at 1200 New Hampshire Avenue NW, Washington, D.C., which serves as a hub for the network's U.S. operations, including content production and distribution targeted at American audiences.

## THE FACTS
### Plaintiff's Background As A Syrian Jewish Refugee

17. Plaintiff Abraham Hamra is a Jewish refugee from Syria, born in Damascus. He fled Syria with his parents and siblings in 1994 at the age of eight, following the partial lifting of restrictions on Jewish emigration by the Syrian regime under President Hafez al-Assad in 1992.

18. Prior to that, Syrian Jews were effectively held captive in their own country, forbidden from leaving and subjected to systemic discrimination, surveillance by the secret police, and periodic violence.

19. This exodus was part of a larger wave of Jewish displacement from Arab countries in the 20th century, driven by anti-Jewish pogroms, nationalism, and hostility which intensified after the establishment of the State of Israel in 1948.

20. The plight of Syrian Jews, like that of Jewish communities across the Middle East, was exacerbated by historical events of violent dispossession and persecution. One such emblematic event is the Farhud, a pogrom that began on June 1–2, 1941, in Baghdad, Iraq, during the Jewish holiday of Shavuot.

21. Inspired by Nazi propaganda and local pro-Nazi sentiments amid World War II, Iraqi mobs, encouraged by a failed pro-Nazi coup, attacked the Jewish community.

22. Over 180 Jews were murdered, more than 1,000 were injured, hundreds of women were raped, and approximately 900 Jewish homes and 550 businesses were looted and destroyed.

23. The Farhud marked a turning point, accelerating the decline of Iraq's ancient Jewish community and symbolizing the broader pattern of anti-Jewish violence that led to the expulsion or flight of nearly 900,000 Jews from Arab countries and Iran between 1948 and the 1970s.

24. While the Farhud took place in Iraq, it reflects the regional anti-Semitism that affected neighboring countries like Syria, where Jews faced similar pogroms, such as the 1947 Aleppo riots that killed 75 Jews and destroyed synagogues, contributing to the eventual mass exodus.

25. Plaintiff's family history is intertwined with this legacy of persecution. His relative, Rabbi Avraham Hamra, served as the last Chief Rabbi of Syria and played a key role in aiding the community's escape in the 1990s, helping thousands of Syrian Jews emigrate.

26. As a descendant of this resilient community, Plaintiff has dedicated himself to educating others about Jewish history in the Arab world, combating antisemitism, and advocating for coexistence, often drawing on his personal experiences as a refugee to counter narratives that deny or minimize Jewish indigeneity and suffering in the Middle East.

### Defendants' History Of Anti-Semitic Commentary, Anti-Zionist Bias, And Ties To Hamas

27. Defendants have a long and well-documented history of anti-Semitic commentary and anti-Zionist bias, often masquerading as objective journalism while promoting narratives that demonize Israel and Jewish people.

28. This pattern of misconduct underscores Defendants' reckless disregard for the truth in their reporting on Israel-related matters, including the defamatory post at issue in this case.

29. Numerous critics, including journalists and watchdog organizations, have accused Defendants of anti-Semitic and anti-American bias in their content.

30. For example, in 2008, Defendants hosted an on-air birthday party for Samir Kuntar, a convicted terrorist who killed Israeli civilians, referring to him as a "pan-Arab hero." Defendants later admitted this violated their code of ethics but only after significant backlash.

31. In 2017, Defendants retweeted an anti-Semitic meme on their English-language account, later apologizing and calling it a mistake.

32. In 2019, Defendants' AJ+ channel produced a video denying and minimizing the Holocaust, claiming the number of Jewish victims was exaggerated to benefit Israel; the video was deleted only after international outrage, and Defendants suspended the journalists involved.

33. Defendants' anti-Zionist bias is evident in their skewed coverage of the Israeli Palestinian conflict, where they have been accused of favoring Hamas and Palestinian narratives while ignoring or downplaying Israeli perspectives.

34. Israel has boycotted Defendants since 2008, accusing them of incitement to terror and bias in Gaza coverage, such as referring to Palestinians killed by Israelis as "martyrs" but not applying the term to Israelis killed by Palestinians.

35. Defendants have also been criticized for their pro-Qatar bias, as they receive funding and direction from the Qatari government, which manipulates coverage to align with its foreign policy interests, including support for Islamist groups like the Muslim Brotherhood.

36. Defendants' ties to terrorism further illustrate their lack of journalistic integrity. Israeli forces have uncovered documents in Gaza revealing that several Al Jazeera journalists are operatives for Hamas and Palestinian Islamic Jihad (PIJ).

37. Specifically, in October 2024, the Israel Defense Forces (IDF) disclosed evidence showing six journalists, Anas Jamal Mahmoud Al-Sharif, Alaa Abdul Aziz Muhammad Salama, Hossam Basel Abdul Karim Shabat, Ashraf Sami Ashour Saraj, Ismail Farid Muhammad Abu Omar, and Talal Mahmoud Abdul Rahman Aruki as military affiliates of these terrorist organizations.

38. The evidence includes personnel tables, training course lists, phone directories, and salary documents confirming their roles in Hamas's military wing and propaganda efforts.

39. Additionally, in 2011, Al Jazeera's Afghan bureau chief, Samer Allawi, was arrested by Israeli authorities for contacting a Hamas agent.

40. In 2024, the IDF accused other Al Jazeera reporters of being Hamas commanders, including one wounded in Gaza who was identified as a deputy commander.

41. On information and belief, Abdullah Al-Jamal, a journalist affiliated with Al Jazeera, permitted his home to be used to detain Israeli hostage Almog Meir Jan.

42. In 2025, the Israel Defense Forces disclosed that Al Jazeera correspondent Anas al-Sharif was not merely a journalist but was receiving a salary from Hamas and was a member of the organization.

43. On or about October 7, 2023, Anas Al-Sharif publicly posted images of himself together with Yahya Sinwar and other senior Hamas leaders.



44. Moreover, on October 7th, this Al Jazeera operative publicly lauded the terrorists as heroes for their .



45. Records reflect that Al-Sharif was formally enlisted into Hamas on or about March 12, 2013, and was affiliated with the Hamas East Jabalya Battalion.

46. On information and belief, Ishmail Abu Omar, reported as a journalist for Al Jazeera, also served as a Hamas commander.

47. A list of Al Jazeera affiliates also names Ishmael Eul as a ranking member of Hamas.

48. These facts reflect a pattern in which individuals presented as journalists affiliated with Al Jazeera simultaneously held positions of membership, command, or direct support within Hamas.

49. Reports indicated that these Al Jazeera operatives were integrated into Hamas's propaganda and military infrastructure, further demonstrating that Defendants' operations in Gaza were compromised by terrorist affiliations and not independent journalism.

50. Upon information and belief, Al Jazeera has itself been implicated in a coordinated media campaign involving approximately 150 outlets organized by Reporters Without Borders ("RSF) and Avaaz to mount an anti-Israel campaign.

51. This underscores that the threats and false narratives directed at Plaintiff Hamra are not isolated incidents, but rather part of a broader, orchestrated media effort in which Al Jazeera is a participant, thereby compounding the harm to Plaintiff and heightening the imminence of further injury.

52. This history of anti-Semitism, anti-Zionist bias, and connections to Hamas operatives demonstrates Defendants' pattern of publishing false and inflammatory content targeting individuals perceived as supportive of Israel, such as Plaintiff, with actual malice and reckless disregard for the truth.

THE DEFAMATORY POST

53. On or about August 25, 2025, Defendants published a defamatory post on their official Instagram account (@aljazeeraenglish) with over 6,400,000 followers. The post included a video and text stating: "Videos show social media influencers who were invited by #Israel's government to tour #GHF aid sites in #Gaza, where the UN has declared a stage five famine. #Israel_Gaza_War."

54. Accompanying the post was an image of Plaintiff standing alongside another individual near aid supplies, with overlaid text reading: "These influencers were reportedly paid to visit Gaza's GHF aid sites." The offending publication is shown below:



55. The post directly identifies Plaintiff as one of the "influencers" who was "reportedly paid" by the Israeli government, implying he accepted compensation to participate in a government-sponsored propaganda tour.

56. This accusation is false in its entirety. Plaintiff has never received any payment, compensation, or financial incentive from the Israeli government or any affiliated entity for visiting aid sites in Gaza.

57. The visit by Plaintiff related to Israel and Gaza was undertaken independently, in his personal capacity, on his own dime, as an advocate for his community and to bear witness against misinformation.

58. Defendants knew or recklessly disregarded the falsity of the statement.

59. The post cites no sources for the "reportedly paid" claim, and publicly available information about Plaintiff, including his professional bio, social media posts, and known activities, demonstrates he is an independent U.S. attorney with no financial ties to foreign governments.

60. Defendants failed to conduct even basic fact-checking, such as contacting Plaintiff for comment or verifying the allegation, despite their status as a major media network with resources to do so.

61. In addition, one of the slides in the Defendants' Instagram post explicitly stated that "Israel continues to block journalists' requests to travel to Gaza in order to report independently." By juxtaposing this statement with images of Plaintiff identified as one of the "influencers," Defendants falsely and maliciously implied that Plaintiff is not independent, but rather compromised and aligned with a foreign government's propaganda.

62. This further injured Plaintiff's professional reputation as an attorney and public commentator by suggesting he lacks integrity and impartiality.

63. This reckless publication, combined with Defendants' history of bias, evidences actual malice.

64. As evidenced by the comments, the Defamatory Post has ignited a lynch mob mentality with members of the public demanding information as to Plaintiff's personal details and whereabouts.

65. The defamatory statement constitutes libel *per se* under New York law because it accuses Plaintiff of committing a serious crime, namely, violating FARA by acting as an unregistered foreign agent for Israel, and tends to injure him in his profession as a lawyer.

66. FARA requires individuals acting as agents of foreign principals to register with the U.S. Department of Justice, and failure to do so is a federal offense punishable by fines and imprisonment.

67. By falsely alleging Plaintiff was paid by a foreign government to promote its interests, the statement implies criminal conduct and undermines his professional integrity, suggesting he lacks independence and ethical compliance essential to legal practice.

68. The post has garnered over 60,000 likes, has been viewed over 1.4 million times and has received widespread engagement, amplifying the harm.

69. As a result, Plaintiff has suffered reputational damage, including public ridicule, loss of client trust, diminished professional opportunities, and emotional distress.

70. Potential clients in the immigration field, where FARA compliance is particularly scrutinized, may avoid Plaintiff due to the false implication of foreign influence.

71. As evidenced by the numerous public comments to Defendants' defamatory post, Plaintiff has been subjected to threats, harassment, and calls for coordinated targeting of his social media accounts.

72. These comments demand that Plaintiff be "exposed," "reported," "blocked on a massive scale," and contain inflammatory accusations likening him to war criminals and traitors.

73. Such online campaigns have a chilling effect and create real danger in the modern environment where social media outrage frequently escalates into physical threats.

74. The gravity of these threats is underscored by the recent violent attack against author Salman Rushdie, who was targeted after years of similar incitement.

75. Plaintiff reasonably fears for his safety, his professional livelihood, and his family's security. Monetary damages alone are insufficient to remedy these harms.

## FIRST CAUSE OF ACTION
(Defamation - Libel Per Se)

76. Plaintiff repeats and realleges the allegations in paragraphs 1 through 68 as if fully set forth herein.

77. Defendants published a false and defamatory statement of fact about Plaintiff on Instagram, accusing him of being paid by the Israeli government.

78. The statement was published to third parties and is defamatory per se, as it accuses Plaintiff of a crime and injures him in his trade, business, or profession.

79. Defendants acted with actual malice, knowing the statement was false or with reckless disregard for its truth.

80. As a direct and proximate result, Plaintiff has suffered damages, including presumed damages to his reputation, in an amount to be determined at trial, but not less than $1,000,000.

## SECOND CAUSE OF ACTION
(Preliminary and Permanent Injunctive Relief)

81. Plaintiff repeats and realleges the allegations in paragraphs 1 through 73 as if fully set forth herein.

82. Defendants' continued publication of the defamatory statement and failure to retract or correct it subjects Plaintiff to ongoing irreparable harm, including reputational injury, harassment, and threats to his safety.



83. Plaintiff has no adequate remedy at law because damages cannot fully repair the loss of reputation, the chilling of professional opportunities, or the threat to his physical security.

84. Plaintiff is therefore entitled to preliminary and permanent injunctive relief ordering Defendants to:

    (a) remove the defamatory post from all platforms;

    (b) cease and desist from further defamatory publications concerning Plaintiff: and

    (c) issue a public retraction and correction.

## JURY DEMAND

Abraham Hamra hereby requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

    a. Compensatory damages in an amount to be determined at trial, but not less than $1,000,000;

    b. Punitive damages in an amount to be determined at trial;

    c. Preliminary and permanent injunctive relief directing Defendants to remove the defamatory publication, refrain from republishing it, and issue a retraction;

    d. Prejudgment and post judgment interest;

    e. Costs and attorneys' fees; and

    f. Such other and further relief as the Court deems just and proper.



Dated: August 27, 2025

GS2LAW PLLC

_____

Robert Garson (RG 1521)
Yosef Shwedel
(*pro Hac Vice to be Submitted*)
20801 Biscayne Blvd, Suite 506
(305) 780-5212
rg@gs2law.com
ys@gs2law.com

*Attorneys for Plaintiff*