**GS2LAW**

Robert Garson
20801 Biscayne Blvd., Ste 506
Aventura, FL 33180
E: rg@gs2law.com
P: +1.305-780-5212

June 17, 2026

The Honorable Joan M. Azrack
U.S. District Court for the Eastern District of New York
100 Federal Plaza, Courtroom 920
Central Islip, New York 11722

**Re:**    ***Abraham Hamra v. Al Jazeera Media Network, et al.*, Case No. 2:25-cv-04774**

Dear Judge Azrack,

As the Court is aware, we represent Plaintiff Abraham Hamra ("Plaintiff") in the above-captioned matter and write in response to the letter submitted by Counsel for Defendants dated June 12, 2026, in which supplemental authority in further support of Defendants' Motion to Dismiss was submitted. Neither of the holdings in the referenced cases supports the dismissal nor advances the discussion in the instant case, as both the facts and legal principles are vastly different.

The first case submitted for your review by Counsel for Defendants, *Taibbi v. Higgins,* 2026 WL 1223643 (S.D.N.Y. May 5, 2026) is one with which we are intimately familiar since we are Mr. Taibbi's attorneys in the matter and that ruling is now the subject of appeal to the 2nd Circuit. Counsel for Defendants asserts in his letter that Mr. Taibbi's claim was rejected because "a plaintiff cannot sustain a libel claim if the allegedly defamatory statement is not 'of and concerning plaintiff but rather only speaks about a group of which the plaintiff is a member.'" Defendants wish to parlay this outtake into the instant case as it is the Defendants' assertion that Plaintiff was merely referenced in their reporting as a member of a group that visited Gaza. However, a closer read of that outtake from *Taibbi* reveals that the facts are markedly different. The defendants in *Taibbi* are the author and publishers of a book in which they made allegations about a broad group of people in the same professional category of journalists across a period of time. Hon. Daniels erred, in our view, in holding that some of the allegations are non-actionable opinion, which is at the core of that case. However, the defendants in this case, Al Jazeera Media Network and Al Jazeera International (USA) LLC, have made specific allegations of fact, not opinion, that Abraham Hamra was paid by the Israeli government, a well-trodden trope utilized by Defendants in order to infer partiality and undermine their lived experience, which is uniquely leveled at those who espouse pro-Israel views.

The second case submitted for the Court's review by Defendants, *Epps v. Fox News Network, LLC*, 2026 WL 1266101 (D. Del. May 8, 2026) is similarly inapplicable to the instant case. The snippet of the ruling quoted by Counsel for Defendant in his letter comes after a list of assertions made by the now-former Fox News personality turned conspiracy theorist, Tucker Carlson, describing the plaintiff's videotaped actions during a two-day period to present a documented pattern of behavior that Mr. Carlson alleged were consistent with the actions of somebody who may have been an FBI informant. This case, however, centers on Al Jazeera's unsubstantiated allegations of an actual financial relationship between Plaintiff and a foreign government. While the court in *Epps* found that defendant's speculation about Mr. Epps's

Continuation Page

relationship with the FBI was not "so inherently improbable that it rises to the level of actual malice," such a determination is simply inapplicable to this case given the lack of documentation, video-taped or otherwise, or journalistic method of Al Jazeera in its reporting on Plaintiff. This is why the Court in its telephone conference stated that this matter would very probably be progressing to discovery. Of course, once discovery is completed, there is nothing inhibiting Defendants from moving for summary judgement if Defendants can point to some evidence that may provide the basis for its conspiracy theories.

This case also differs from both *Taibbi* and *Epps* because it involves not an American author and publisher and an American television pundit but rather a known paid-for propaganda arm of the Qatari government. These allegations are substantiated in a recently released report from the Foundation for Defense of Democracies, attached hereto, which states that "the Qataris wield the Al-Jazeera Media Network, which broadcasts in multiple languages and multiple formats, to spread the regime's messages." It also asserts that "Al Jazeera's U.S.-based affiliate, AJ+, has defied U.S. law for over five years by failing to register as a foreign agent" and that "Doha's state-owned Al Jazeera Media Network amplifies Islamist propaganda for an audience of hundreds of millions of viewers worldwide." This has been so concerning to other countries in the Middle East that "in 2017, Saudi Arabia, the United Arab Emirates (UAE), Bahrain, and Egypt severed ties with Qatar citing a range of grievances, including its purported support for 'terrorist organizations' and Al Jazeera's incitement of extremism." The report also states that "a clip of former Qatari Prime Minister Hamad bin Jassim Al-Thani resurfaced in November 2025 in which he boasts that Doha 'had journalists on our payroll in many countries.' This would not be surprising, given Qatar's creation and control of the Al Jazeera Media Network, which asserts its independence but serves as the emirate's global media arm, promoting Islamist and anti-Western content."[1] These facts heighten the importance of this case, given that the Defendants are hiding behind a veil of being legitimate media sources and availing themselves of press freedoms while simultaneously peddling tropes.

Plaintiff respectfully submits that the holdings in *Taibbi* and *Epps* in no way support dismissal of this case and further asserts that Defendants in this case, as an effective extension of a foreign government, bear little resemblance to the American citizen defendants in *Taibbi* and *Epps,* further limiting the applicability of those rulings to this case.

We thank the Court for its consideration and would be grateful if this case could move forward to the discovery phase.

Respectfully submitted,

*/s/ Robert Garson*
Robert Garson

*Counsel for Defendants*

cc:     John M. Hillebrecht, Esq. (via ECF)

---

[1] https://www.fdd.org/wp-content/uploads/2026/06/fdd_memo_mapping_qatars_footprint_in_the_united_states.pdf

www.gs2law.com



# Mapping Qatar's $400 Billion Footprint in the United States

**By Natalie Ecanow**

**June 2026**

## Foreword

**By Jonathan Schanzer**

Why has a country of just 330,000 citizens that is half the size of New Jersey and a leading patron of the Muslim Brotherhood plowed $400 billion dollars into the United States? This amounts to approximately $1.2 million per Qatari citizen — an enormous sum.

FDD's Natalie Ecanow has labored for more than a year, collecting the receipts for these Qatari transactions, most of which have taken place over the past decade. But as Natalie notes, $400 billion is a lowball estimate. She erred on the side of caution. If you take the word of Qatari government estimates or even the White House, the total number may exceed $1.2 trillion.

Some Americans may welcome the generosity of the Qatari regime. After all, one could argue that a great many of these investments — spanning energy, defense, biotech and other important sectors — serve to benefit the U.S. economy and U.S. citizens. One could also argue that Qatar, like Japan, Canada, or other countries that sink billions in the United States, simply seeks return on investment.

But Qatar is different. There are more than a few reasons to question the largesse of the Qatari government. At the end of the day, Qatar is ruled by an Islamist, autocratic regime; Freedom House consistently ranks the country as "Not Free" in its annual Freedom in the World survey.[1] And Doha's failure to guarantee the rights of its citizens is not the biggest problem. Rather, it is the country's tendency to support jihadi causes in the Middle East that raises significantly more concern. The country's horrific track record in this regard distinguishes Qatar from other Gulf states that spread their wealth in America.

Though the U.S. government has delineated Qatar as a "Major Non-NATO Ally" and has positioned its Combined Air Operations Center at the Al-Udeid base in Qatar, this regime may qualify as a "State Sponsor of Terrorism." The regime has sheltered Al-Qaeda.[2] It was a patron for the Taliban before the group recaptured Afghanistan, ending

---

1. "Freedom in the World 2026, Qatar," *Freedom House*, accessed May 26, 2026. (https://freedomhouse.org/country/qatar/freedom-world/2026)

2. David Andrew Weinberg, "Qatar and Terror Finance: Part II: Private Funders of al-Qaeda in Syria," *Foundation for Defense of Democracies*, January 2017. (https://s3.us-east-2.amazonaws.com/defenddemocracy/uploads/documents/11717_Weinberg_Qatar_Report.pdf)

America's intervention there.[3] The government is a longstanding patron of Hamas, the terrorist group that plunged the Middle East into violence on October 7, 2023.[4] Finally, it is the primary patron of the Muslim Brotherhood, a global network of violent and nonviolent Islamist groups that seek the downfall of the West.[5] Several branches of this network have recently been sanctioned by the U.S. government.

Beyond that, the regime in Qatar has been embroiled in other scandals that should give Americans pause. Qatar bribed its way to hosting the World Cup in 2022. Later that year, the scandal known as "Qatargate" rocked the European Union when Qatari bribes to European parliamentarians were exposed.[6] The bribes were reportedly designed to buy influence to rehabilitate Qatar's image amid reports that more than 6,500 migrant workers had died during the construction of the country's World Cup stadiums.[7]

To whitewash these and other offenses, the Qataris wield the Al-Jazeera Media Network, which broadcasts in multiple languages and multiple formats, to spread the regime's messages.[8] Al Jazeera's U.S.-based affiliate, AJ+, has defied U.S. law for over five years by failing to register as a foreign agent.[9]

It is for these reasons, and perhaps others, that Qatar's massive investments in the United States should be scrutinized. Some of these investments include naked influence-peddling — from sponsorship of the annual congressional baseball game to annual White House correspondents' dinner parties.[10] The Qataris spend an enormous amount on lobby groups and public relations, which helps ensure that their investments continue with minimal scrutiny.

Perhaps most disturbing is the massive amount this small Islamic state has invested in American education. Qatar has half as many citizens as Washington, DC, has residents. Yet somehow, it has surpassed China as the largest foreign funder of American colleges and universities. This is baffling. It is safe to say that the regime in Doha is not a stalwart champion of traditional liberal arts education curricula. Even more disturbing: the regime is funding public K-12 schools, engaging American children in the classroom at a young age.

In an era of heightened cognitive combat, disinformation, and foreign influence, it is time for the United States government to look not just at China and Russia, but other autocratic states — and maybe democracies, too. Examining foreign capital is especially important when the numbers rise above a certain threshold. While it might

...............................

**3.** "How Qatar came to host the Taliban," *BBC* (UK), June 22, 2013. (https://www.bbc.com/news/world-asia-23007401)

**4.** Jonathan Schanzer, "Stop With the Nice Words on Qatar," *Commentary*, December 3, 2023. (https://www.commentary.org/jonathan-schanzer/stop-with-the-nice-words-on-qatar)

**5.** "Muslim Brotherhood in Qatar," *Counter Extremism Project*, accessed May 26, 2026. (https://www.counterextremism.com/content/muslim-brotherhood-qatar)

**6.** Shari Hinds, "Three Years Since Qatargate: Has the European Parliament Learned Its Lesson?" *Transparency International EU*, December 9, 2025. (https://transparency.eu/three-years-since-qatargate-has-the-european-parliament-learned-its-lesson)

**7.** Juliana Kim, "FIFA should pay workers harmed in building World Cup venues, its committee report says," *NPR*, November 30, 2024. (https://www.npr.org/2024/11/30/nx-s1-5211297/soccer-qatar-world-cup-saudi-arabia-human-rights)

**8.** Jon Levine, "Inside Al Jazeera's Style Guide, Which Forbids Reporters From Calling ISIS a 'Terrorist' Organization," *The Washington Free Beacon*, February 20, 2026. (https://freebeacon.com/media/inside-al-jazeeras-style-guide-which-forbids-reporters-from-calling-isis-a-terrorist-organization)

**9.** Marc Tracy and Lara Jakes, "U.S. Orders Al Jazeera Affiliate to Register as Foreign Agent," *The New York Times*, September 15, 2020. (https://www.nytimes.com/2020/09/15/business/media/aj-al-jazeera-fara.html); U.S. House of Representatives Committee on Oversight and Government Reform, Press Release, "Comer Opens Probe into DOJ's Failure to Enforce FARA Requirements," February 8, 2024. (https://oversight.house.gov/release/comer-opens-probe-into-dojs-failure-to-enforce-fara-requirements)

**10.** Kate Oczypok, "Social Scene, Your Guide to the 2026 White House Correspondents Dinner Weekend," *The Georgetowner*, April 23, 2026. (https://georgetowner.com/articles/2026/04/23/your-guide-to-the-2026-white-house-correspondents-dinner-weekend); @moody, *X*, July 31, 2014. (https://x.com/moody/status/494940874338344960)